**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| ADAM CRAWFORD and LUCIA DEPRETTO, individually and on behalf of the CDI Corporation 401(K) Savings Plan, :<br><br>Plaintiffs, :<br><br>v. :<br><br>CDI CORPORATION, BOARD OF DIRECTORS OF CDI CORPORATION, CDI CORPORATION 401(K) SAVINGS PLAN COMMITTEE, and JOHN DOES 1-30, :<br><br>Defendants. : | CIVIL ACTION NO.: 2:20-cv-3317 |

---

## CLASS ACTION COMPLAINT

Plaintiffs Adam Crawford and Lucia DePretto ("Plaintiffs"), by and through their undersigned attorneys, on behalf of the CDI Corporation 401(k) Savings Plan (the "Plan"),[1] themselves and all others similarly situated, allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1109 and 1132, against the Plan's fiduciaries, which include CDI Corporation, ("CDI" or the "Company"), the Board of Directors of CDI Corporation and its members (the "Board") during the Class Period (defined below), and the CDI Corporation 401(k) Savings Plan Committee and its members (the "Committee" or "Plan Committee") during the Class Period for breaches of their fiduciary duties. Defendants CDI, the

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Board and the Committee are referred to collectively as "Defendants".

2.      Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which **$5.6 trillion was held in 401(k) plans**. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).[2]

3.      In a defined *contribution* plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

4.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.      Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion).

---

[2] Available at: https://ici.org/research/stats/retirement/ret_20_q1  (last visited July 2, 2020).

6.       As of December 31, 2018, the Plan had more than $263 million in assets that are entrusted to the care of the Plan's fiduciaries. The Plan's assets under management qualifies it as a large plan in the defined contribution 401(k) marketplace. As a large plan, the Plan has substantial bargaining power regarding the fees and expenses that are charged against participants' investments. However, to the extent that Defendants made any attempt to reduce the Plan's expenses or to monitor and review the Plan's investment options, they employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to participants were reasonable, and (b) that each investment option that was offered in the Plan was prudent.

7.       During the proposed Class Period (July 7, 2014 to the present) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, Plaintiffs, and the Plan's other participants by, *inter alia*: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories. Additionally, Defendants failed to select the lowest-cost share class for many of the funds within the Plan.

8.       Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

9.       Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.   <u>JURISDICTION AND VENUE</u>

10.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

11.    This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the Plan is administered, where at least one of the alleged breaches took place and where Defendants reside.

## III.   <u>STANDING</u>

13.    An action under 29 U.S.C. § 1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *LaRue*, 552 U.S. at 254. 29 U.S.C. § 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2). As explained below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continuing losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury, even though 29 U.S.C. § 1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

14.    Plaintiffs and all participants in the Plan suffered financial harm as a result of the imprudent investment options in the Plan because Defendants' selection and retention of those

options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent options.

15.     Plaintiffs' individual accounts in the Plan were harmed because they invested in investment options that would have been removed from the Plan had Defendants discharged their fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plan, resulting in a loss of retirement savings.

## IV.   PARTIES

### Plaintiffs

16.     Plaintiff Adam Crawford currently resides in Las Vegas, Nevada. He was employed at CDI in Atlanta, Georgia during the period from 2013 to 2019. During his employment, Plaintiff Crawford participated in the Plan and invested in the following options offered by the Plan: William Blair Small-Mid Cap Growth I fund (110 bps), Alger Capital Appreciation Institutional I fund (115 bps), JPMorgan Large Cap Growth R5 fund (56 bps).[3]

17.     Plaintiff Lucia DePretto currently resides in Brookhaven, Georgia. She was a CDI employee from November 2007 to December 2018. During her employment, Plaintiff DePretto participated in the Plan and invested in the following options offered by the Plan: JPMorgan Large Cap Growth R5 fund (56 bps); Putnam Large Cap Value Trust I CIT (40 bps); Putnam S&P 500 Index Fund Class M (9 bps); American Funds New Perspective R5E fund (55 bps); American Funds EuroPacific Growth R5E (65 bps); MFS Global Real Estate R6 fund (90 bps); Invesco Oppenheimer Developing Markets I (83 bps); Putnam Income Y fund (49 bps); Templeton Global

---

[3] The expense ratios for Plaintiffs' Plan investments are in parentheses and expressed in basis points, which is one hundredth of a percent or equivalently 0.01%.

Bond R6 fund (57 bps); William Blair Small-Mid Cap Gr I fund (110 bps); Vanguard Small Cap Index Fund – Admiral (5 bps); DFDIX Delaware Smid Cap Growth Instl. fund (87 bps); and IGLAX Voya Global Real Estate I fund (131 bps)

18.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

19.     Plaintiffs did not have knowledge of all material facts (including, *inter alia*, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, and information regarding other available share classes, necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

20.     Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. Plaintiffs did not, and could not, review the Committee meeting minutes or other direct evidence of Defendants' fiduciary decision making, or the lack thereof. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**Company Defendant**

21.    CDI Corporation (defined above as "CDI" or the "Company"), is a privately held Pennsylvania corporation with a principal place of business located at 1735 Market Street, Suite 200, Philadelphia, Pennsylvania 19103. CDI is the Plan sponsor and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) CDI is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets, and (c) it appointed Plan fiduciaries through the CDI Corporation 401(k) Savings Plan Committee, which is appointed to serve as the Plan Administrator and was responsible for monitoring those fiduciaries. According to CDI's corporate filings, its registered agent for service is CT Corporation.

22.    At all times relevant to this action, CDI has been responsible for the administrative and investment responsibilities associated with the Plan and has been the "named fiduciary" and "plan administrator," as such terms are defined under ERISA.

23.    CDI has delegated certain administrative and investment related duties to the CDI Corporation 401(k) Savings Plan Committee (defined above as the "Committee" or "Plan Committee").

24.    Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

**Board Defendants**

25.    Each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to

appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

26.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27.     On information and belief, the Board has discretion to authorize CDI to contribute annual profit-sharing amounts to the Plan participants.

**Plan Committee Defendants**

28.     On information and belief, CDI has delegated certain administrative and investment related duties to the Plan Committee and/or other committees and their members are named fiduciaries of the Plan.

29.     On information and belief, the Plan Committee is responsible for the following Plan functions:

- To act as a "Named Fiduciary" under ERISA with respect to the control and management of assets of the Plan and provide oversight of the investments and funding policies and objectives of the Plan.

- Establish and periodically review the investment management policies and/or guidelines of the Plan.

- Approve the appointment of investment managers for the Plan, and the policies and operating procedures governing investment managers.

- Monitor the investment performance of the Plan.

- Receive, review and keep on file reports of investment performance, financial condition, receipts and disbursements of the Plan's assets.

- Appoint and retain individuals to assist in the administration of the Committee's duties under the Committee Charter and under the Plan, including consulting services as it may require or as may be required by any applicable law or laws.

- Appoint and remove the trustee for the Plan and the Plan's trust.

- Report to the Board.

30.     The Plan Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

31.     The Plan Committee and unnamed members of the Plan Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

32.     To the extent that there are additional officers and employees of CDI who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, CDI officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## V.     THE PLAN

33.     CDI established the Plan in 1985 "for the benefit of its eligible employees and the eligible employees of certain of its affiliates that have adopted the Plan. The Plan is a defined contribution 401(k) plan and provides "additional incentive and retirement security for eligible employees by permitting them to make elective contributions on a pre-tax basis and thereby share in Company matching contributions." *See* 2018 Form 5500, Notes to Financial Statements at 6; Summary Plan Description ("SPD") at 5.

34.     The Plan is a single-employer "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for

9

individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

35.     Great-West Trust Company, LLC ("Great-West"), is a financial holding company and consultant providing trustee and custodial services to employer-sponsored retirement plans, such as the Plan. CDI and/or the Plan Committee retained Great-West to assist in their role in selecting and monitoring the Plan's investment options. *See* 2018 Form 5500, Notes to Financial Statements, at 10, 11. Great-West is also responsible to invest cash received, interest and dividend income. *Id. at* 10.

### *Eligibility*

36.     The SPD provides that employees of CDI and its subsidiaries "who have attained the age of eighteen are eligible to participate in the Plan as of the first day of any payroll period beginning as soon as administratively practicable after the date on which the employee becomes eligible to participate." 2018 Form 5500, Notes to Financial Statements, at 6.

### *Contributions*

37.     Participants may contribute to their individual accounts by way of:

- Elective Deferral Contributions;

- Roth Contributions;

- Catch-Up Contributions;

- Rollover Contributions; and

- Employer Matching Contributions.

SPD at 12.

38.     With regard to employee contributions, a participant may contribute up to $18,000.00 of pre-tax annual compensation. *Id.* at 13. CDI matches employee elective contributions at the rate of 33.3% up to the first 6% of eligible contributions. The Company does not match additional employee elective contributions.

39.     Under the Plan, a participant is 100 percent vested in their salary deferral contributions and any rollover account contributions, regardless of the length of service. Participants become fully vested in both their contributions and Company contributions plus actual earnings thereon after three years of service. 2018 Form 5500 at 60; *see also* SPD at 17.

### The Plan's Investments

40.     Various funds were available to Plan participants for investment during the Class Period, including funds from American Funds, Blackrock, Inc., Columbia Threadneedle Investments, Great-West Funds, Inc., Invesco, John Hancock Investment Management, J.P. Morgan Funds, Franklin Templeton Investments, Putnam Investments, and The Vanguard Group.

41.     "The [Plan] Committee monitors the performance of the Investment Funds and has the right to change the Investment Funds that are offered from time to time with the exception of the Company Stock Fund." SPD at 18.

42.     According to the Plan's reports on Form 5500, the Plan's assets under management for all funds was $263,291,845 as of December 31, 2018, and was $300,979,460 as of December 33, 2017.

## VI.    CLASS ACTION ALLEGATIONS

43.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf

of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between July 7, 2014 and the present (the "Class Period").

44.     The members of the Class are so numerous that joinder of all members is impractical. According to the 2018 Form 5500 filed with the U.S. Department of Labor, there were 7,030 Plan participants with account balances, as of December 31, 2018.

45.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

46.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are fiduciaries of the Plan;
> B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;
> C.     Whether the Board Defendants failed to adequately monitor the Plan Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;
> D.     The proper form of equitable and injunctive relief; and
> E.     The proper measure of monetary relief.

47.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

48.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

49.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII. DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

50.     ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

51.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority

or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

52.     As described above, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

53.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

54.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (internal citations omitted). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

14

55.     "Thus, in deciding whether and to what extent to invest in a particular investment, *a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income*. A decision to make an investment may not be influenced by non-economic factors unless the investment, *when judged solely on the basis of its economic value to the plan*, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

56.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

57.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist in a plan, which is "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds...could theoretically, in combination, create a prudent portfolio." *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

58.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by

co-fiduciary") provides:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

59.     During the Class Period, Defendants did not act in the best interests of the Plan's participants. Investment options chosen for a plan should not favor the fund provider over the plan's participants. Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many investment options that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

60.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for each of the Plan's investment options. Additionally, Defendants failed to leverage the size of the Plan to negotiate the lowest expense ratio available for certain investment options maintained and/or added to the Plan during the Class Period.

61.     As set forth in detail below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

16

## VIII.   SPECIFIC ALLEGATIONS

### A.   Improper Management of an Employee Retirement Plan Cost the Plan's Participants Millions in Savings

62.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

63.      The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[5]

64.      As the Ninth Circuit explained, higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

65.      The Ninth Circuit provided an example of the impact of higher fees over a 40-year

---

[5]      Available      at:      https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 2, 2020).

period, stating:

> As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year,4 at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%,5 the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively.

*Id.*

66.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[6] Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

67.     Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

68.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[7] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.* at 5.

---

[6] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited July 2, 2020).
[7] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited July 2, 2020).

69.    The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds.  The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place funds in a given category based on their portfolio statistics and compositions over the past three years."[8]

70.    On average, there are lower expense ratios for 401(k) participants than for other investors. *See The Economics of Providing 401(k) Plans*, at 11. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, as measured by assets managed, lead to economies of scale and special pricing within mutual funds. *Id.* at 10.

71.    This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, these expense ratios fell 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *Id*. at 1.

72.    Comprehensive average mutual fund expense data for plans of different sizes, and industry analysts have recognized a marked trend toward lower fees in 401(k) plans between 2012 and 2014. *See* Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, THE WALL STREET JOURNAL (May 15, 2016) (noting precipitous drop in overall 401(k) fees from 2012 to 2014).

73.    The table below illustrates how 401(k) plans on average pay significantly lower fees than regular industry investors, even as expense ratios for all investors have declined.

---

[8] Available at http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited July 2, 2020).

FIGURE 7

**Average Total Mutual Fund Expense Ratios**
*Percent, 2013–2015*

| | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
| | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

*The Economics of Providing 401(k) Plans*, at 12. Notably, this table does not take into account cost differences between passively managed funds that are designed to mirror the performance of a market index, and actively managed funds that attempt to outperform the market with more aggressive and complex investment strategies. Actively managed funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research, more frequent trades, and greater monitoring.

74.     Thus, prudent and impartial plan fiduciaries should continuously monitor both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

**1.     Passively Managed Funds Cost Less Than Actively Managed Funds**

75.     Courts have noted that "an ERISA fiduciary's duty is derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828 (quotations and citations omitted). *See also Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996) (ERISA "fiduciary duties draw much of their content from the

common law of trusts"). Thus, to the extent that ERISA is silent on the appropriate standard for selection and retention of investment options for a plan, courts should seek guidance from trust law. *Varity Corp.*, 516 U.S. at 496–97.

76.     Under the common law of trusts, the determination as to whether the selection of an investment is appropriate depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts § 100 cmt. b (1) (2012). The relevant factors that may be considered include "return rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id.*

77.     Here, each investment option within the Plan charged certain fees that are paid by deductions from the pool of assets held by the Plan. For passively managed funds, which are designed to track a market index like the Standard & Poor's 500, securities were purchased to match the mix of companies within the index. Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

78.     By contrast, for the Plan's actively managed funds, which have a mix of securities selected by the fund manager based on his or her belief they will beat the market, the Plan has paid higher fees in order to compensate the fund managers and their associates for the work associated with stock and/or bond picking.

79.     While higher-cost mutual funds may outperform less-expensive passively managed index funds in the short term, they rarely do so in the long term. As noted by Jonnelle Marte in The Washington Post, *Do Any Mutual Funds Ever Beat the Market? Hardly* (Mar. 17, 2015), a study by S&P Dow Jones Indices, which analyzed 2,862 actively managed mutual domestic stock mutual funds over a five-year period, found that "just two funds ... managed to hold on to their

berths in the top quarter every year for five years running. And for the 2,862 funds as a whole, that record is even a little worse than you would have expected from random chance alone."[9] Thus, the funds in the top quartile in performance failed to replicate performance from year to year. *See also Index funds trounce actively managed funds: Study* (June 26, 2015) (reporting that data shows that "actively managed funds lagged their passive counterparts across nearly all asset classes, especially over a 10-year period from 2004 to 2014.")[10]

80.     Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967–75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

81.     The case for indexing was emphasized by *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 34 (1st Cir. 2018), *cert. denied*, 140 S. Ct. 911, 205 L. Ed. 2d 455 (2020), where the First Circuit applied the common law of trusts in ruling that "it is reasonable to compare the actual returns on that portfolio to the returns that would have been generated by a portfolio of benchmark funds or indexes comparable but for the fact that they do not claim to be able to pick winners and losers, or charge for doing so. Restatement (Third) of Trusts, § 100 cmt. b(1) (loss determinations can be based on returns of suitable index mutual funds or market indexes)...."

---

[9]   Available at:   https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (last visited July 2, 2020).
[10]   Available at:   https://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html (last visited July 2, 2020).

## 2.     Institutional Share Classes Cost Less Than Investor Share Classes

82.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are sold to individual investors who have less bargaining power, while lower cost shares are sold to institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

83.     Large defined contribution plans, like the Plan, have sufficient assets to qualify for the lowest-cost share class available. Even when a retirement plan does not meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan willing to add the fund to its menu of designated investment options. Thus, a fiduciary of a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

84.     The availability of lower-cost institutional class shares for large defined benefit plans has been widely known throughout the Class Period. For instance, a February 2016 article by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin, *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, InvestmentNews (Feb. 18, 2016).[11]

85.     Indeed, a court observed that "[b]ecause the institutional share classes are otherwise

---

[11] Available at: https://www.investmentnews.com/recent-class-action-surge-ups-the-ante-for-401k-advice-66056 (last visited July 2, 2020).

*identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble*, 575 U.S. 523 *Int. et al.*, No. 07-5359, slip op. at 13 (C.D. Cal. Aug. 16, 2017).

86.   As one commentator put it, "The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the 'prevailing circumstances'- such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach." Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, PLAN SPONSOR (Jan. 2011).[12]

87.   Thus, it is incumbent upon large plan fiduciaries, like Defendants, to select the lowest-cost class of shares that is available to the Plan.

**B.    Defendants Breached Their Fiduciary Duties by Selecting More Expensive Share Classes Instead of the Lowest-Cost Institutional Shares of Same Funds**

88.   The Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises,

---

[12] Available at:  https://www.plansponsor.com/magazine/class-ifying-mutual-funds/ (last visited July 2, 2020).

and seminal decisions confirming the duty.

89.    The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id*. § 2 comment.

90.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

91.    As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost. The chart below uses 2020 expense ratios, the most recent data available, to demonstrate how much more expensive the share classes in the Plan were than available lower-cost share classes.

| Fund in Plan | Value[13] | Net Expense Ratio[14] | Lower Cost Share Class of Same Fund | Net Expense Ratio[15] |
|---|---|---|---|---|
| AVUAX<br>American Century Mid Cap Value I | $5,848,951 | 0.78 %[16] | AMDVX<br>American Century Mid Cap Value R6 | 0.63 % |
| RNPEX<br>American Funds New Perspective Fund R4 | $13,067,121 | 0.77 % | American Funds New Perspective Fund R6<br>RNPGX | 0.44% |
| RERHX<br>American Funds EuroPacific Growth R5E<br><br>REREX<br>American Funds EuroPacific Growth R4<br>(in Plan before 12/31/2017) | $4,700,795 | 0.64 %<br>(R5 shares)<br><br>0.84%<br>(R4 shares) | RERGX<br>American Funds Europacific Growth R6 | 0.49 % |
| MDLOX<br>BlackRock Global Allocation Inv A | $1,103,768 | 1.08 % | VAUSA06J4U<br>BlackRock Global Allocation V.I. III | 1.02% |
| SMEIX<br>Invesco Small Cap Equity R5<br>(in Plan before 12/31/2017) | $5,010,979 | 0.85 % | Invesco Small Cap Equity R6<br>SMEFX | 0.81% |
| ODVYX<br>Invesco Oppenheimer Developing Markets Fund Class Y (in Plan before 12/31/2017) | $2,321,583 | 1.07 % | ODVIX<br>Invesco Oppenheimer Developing Markets Fund Class R6 | 0.83% |
| SVBIX<br>John Hancock Balanced Fund Class I<br>(in Plan since approx. 12/31/17)<br><br>JBAFX<br>John Hancock Balanced Fund Class R4<br>(in Plan before 12/31/2017) | $8,958,783 | 0.78 %<br>(Class I shares)<br><br>0.92 %<br>(R4 shares) | JBAWX<br>John Hancock Balanced Fund Class R6 | 0.67% |
| JLGRX<br>JPMorgan Large Cap Growth R5 | $30,813,593 | 0.54 %[17] | JLGMX<br>JPMorgan Large Cap Growth R6 | 0.44 % |
| MGLLX<br>MFS Global Real Estate R3<br>(in plan prior to 12/31/2017) | $1,554,388 | 1.43 % | MGLRX<br>MFS Global Real Estate R6 | 0.90 % |

---

[13] As of December 31, 2018.

[14] As of May 31, 2020.

[15] As of May 31, 2020.

[16] During 2018, the expense ratio charged Plan participants was 0.81%, according to Plan fee disclosures.

[17] During 2018, the expense ratio charged Plan participants was 0.70%, according to Plan fee disclosures.

| Fund in Plan | Value | Net Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|---|
| PNCYX<br>Putnam Income Y | $5,222,722 | 0.49 % | PINHX<br>Putnam Income R6 | 0.37 % |
| PEIYX<br>Putnam Equity Income Y<br>(in Plan before 12/31/2018) | $14,547,640 | 0.66 % | PEQSX<br>Putnam Equity Income R6 | 0.55 % |
| Putnam Stable Value Fund at 35[18] | $24,394,114 | 0.52 % | Putnam Stable Value Fund at 15 | 0.28 % |
| TGBAX<br>Templeton Global Bond Advisor Class<br>(in Plan until 13/31/2017) | $1,536,306 | 0.67 %[19] | FBNRX<br>Templeton Global Bond Fund Class R6 | 0.56 % |
| TRIEX<br>TIAA-CREF International Eq Index Retire<br>(in plan prior to 12/31/2017) | $720,304 | 0.31 % | TCIEX<br>TIAA-CREF International Eq Idx Instl | 0.06 % |
| VSMAX<br>Vanguard Small Cap Index Adm | $7,189,169 | 0.05 % | VSCIX<br>Vanguard Small Cap Index I | 0.04 % |
| WATFX<br>Western Asset Core Bond I | $1,870,949 | 0.56 % | WACSX<br>Western Asset Core Bond IS | 0.42 % |

92.    As the chart above illustrates, throughout the Class Period Defendants should have known of the existence and availability of lower-cost share classes, and they should have promptly transferred the Plan's investments in such funds to these less expensive share classes, however, with respect to at least **16 funds**, Defendants failed to do so. Defendants' failure to select the lowest-cost share class available caused Plan participants to pay excessive fees, which has and will continue to diminish the value of their individual 401(k) accounts.

93.    Qualifying for lower share classes usually requires a minimum of a million dollars for individual funds. As demonstrated in the table above, each of the funds (other than the TIAA-CREF International Eq Index) had more than $1 million in assets, and therefore, the Plan would have easily qualified for lower share classes for these funds.

---

[18] The Putnam Stable Value Fund is not a mutual fund but rather is a Collective Investment Trust.
[19] During 2018, the expense ratio charged Plan participants was 0.78%, according to Plan fee disclosures.

94.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into institutional shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, Defendants did not transfer Plan holdings in any of these funds from higher-priced share classes into the lowest-cost institutional share classes, in breach of their fiduciary duties.

95.     There is no good-faith explanation for utilizing a high-cost share class when a lower-cost share class is available for the exact same investment. The Plan did not receive any additional services or benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants.

**C.     Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

96.     When large plans, like the Plan here, have investment options that approach the retail cost of shares for individual investors or are simply more expensive than the average institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

97.     Throughout the Class Period, the Plan's investment options have been dominated by high cost, actively-managed funds, despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.

98.     During the Class Period, the Plan lost millions of dollars by offering investment options that had similar, if not identical, characteristics to other lower-priced investment options.

99.     Upon information and belief, most funds in the Plan stayed the same during the Class Period. Using services that are readily available to ERISA fiduciaries to analyze the current

Plan offerings, as reported by CDI's 2018 Form 5500, 18 out of the 26 funds in the Plan – 69% of

funds – were significantly more expensive than comparable funds found in similarly-sized plans

(plans having $250 million to $500 million in assets). The expense ratios for funds in the Plan in

some cases are as much as ***180%*** greater than the expense ratio for comparable funds available to

the Plan. *See*, *e.g.*, BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k)*

*Plans, 2015* at 69 (March 2018) ("ICI Study").[20]

100.    The table below provides a comparison of the 18 funds that were available to

Participants during the 2018 Plan year to substantially similar funds that have the same benchmark

index (most of which have at least 90 percent similar holdings), but have significantly lower net

expense ratios:

| Current Fund Option | Net Expense Ratio | Comparable Funds With Lower Fees | Net Expense Ratio |
|---|---|---|---|
| RXPF03174 $11,597,204<br>**Great-West Lifetime Conservative 2015 Trust CIT**<br>Benchmark Index: Morningstar Lifetime Mod 2015 TR USD | 0.68 %[21] | VITVX<br>Vanguard Instl Target Retire 2015 Instl | 0.09 % |
| RXPF03171 $25,488,865<br>**Great-West Lifetime Conservative 2025 Trust CIT**<br>Benchmark Index: Morningstar Lifetime Mod 2025 TR USD | 0.68 % | VRIVX<br>Vanguard Instl Target Retire 2025 Instl | 0.09 % |
| RXPF03175 $25,066,405<br>**Great-West Lifetime Conservative 2035 Trust CIT**<br>Benchmark Index: Morningstar Lifetime Mod 2035 TR USD | 0.68 % | VITFX<br>Vanguard Institutional Target Retirement 2035 Fund | 0.09 % |
| RXPF03172 $16,644,594<br>**Great-West Lifetime Conservative 2045 Trust CIT**<br>Benchmark Index: Morningstar Lifetime Mod 2045 TR USD | 0.68 % | VITLX<br>Vanguard Instl Target Retire 2045 Instl | 0.09 % |

---

[20] *See* https://cdn2.hubspot.net/hubfs/392606/y55434y55435y54.pdf (last visited July 2, 2020).
[21] *See* Notice of Investment Returns & Fee Comparison as of 10/24/2019, reporting the net expense ratios for the Great-West Lifetime Conservative Trust (2015, 2025, 2035, 2045 and 2055).

| Current Fund Option | Net Expense Ratio | Comparable Funds With Lower Fees | Net Expense Ratio |
|---|---|---|---|
| MXXFX $6,993,717<br>**Great-West Lifetime Cnsrv 2055 Instl**<br>Benchmark Index: Morningstar Lifetime Mod 2055 TR USD | 0.69 % | VFFVX<br>Vanguard Target Retirement 2055 Inv | 0.15 % |
| JLGRX $30,813,593<br>**JPMorgan Large Cap Growth R5**<br>Benchmark Index: Russell 1000 Growth TR USD | 0.54 % | VRGWX<br>Vanguard Russell 1000 Growth Index I | 0.07 % |
| $23,999,685<br>**Putnam Stable Value Fund at 35** | 0.52 % | INVRSVC<br>**Invesco Stable Value Trust C**<br>Benchmark Index: Bloomberg Barclays U.S. Treasury Bellwethers (3M) Index | 0.27 % |
| RXPF04176 $19,368,707<br>**Putnam S&P 500 Index Fund Class M**<br>Benchmark Index: Standard & Poor's 500® Composite Stock Price Index | 0.09 % | FXAIX<br>Fidelity 500 Index | 0.02 % |
| | | VFIAX<br>Vanguard 500 Index Admiral | 0.04 % |
| ALARX $17,613,174<br>**Alger Capital Appreciation Institutional I**<br>Benchmark Index: Russell 1000 Growth TR USD | 1.16 % | VMGAX<br>Vanguard Mega Cap Growth Index Institutional | 0.06 % |
| | | VRGWX<br>Vanguard Russell 1000 Growth Index I | 0.07 % |
| | | NASDX<br>Shelton Nasdaq-100 Index Direct | 0.50 % |
| RXPF05109 $11,638,752<br>**Putnam Large Cap Value Trust Class I CIT**<br>Benchmark Index: Russell 1000 Value Index[22] | 0.40 % | TILVX<br>TIAA-CREF Large-Cap Value Idx Inst | 0.06 % |
| | | VMVLX<br>Vanguard Mega Cap Value Index Instl | 0.06 % |
| | | VRVIX<br>Vanguard Russell 1000 Value Index I | 0.07 % |
| | | VSPVX<br>Vanguard S&P 500 Value Index Instl | 0.08 % |
| | | VEIRX<br>Vanguard Equity-Income Adm | 0.18 % |
| SVBIX $8,958,783<br>**John Hancock Balanced I**<br>Benchmark Index: Morningstar Mod Tgt Risk TR USD | 0.77 % | RLBGX<br>American Funds American Balanced R6 | 0.28 % |
| | | FPUKX<br>Fidelity Puritan K | 0.45 % |
| WSMDX $8,311,973<br>**William Blair Small-Mid Cap Gr I**<br>Benchmark Index: Russell Mid Cap Growth TR USD | 1.10 % | OTCKX<br>MFS Mid Cap Growth R6 | 0.74 % |
| | | IGRFX<br>Ivy Mid Cap Growth N | 0.79 % |
| | | CMGIX<br>BlackRock Mid-Cap Growth Equity Instl | 0.80 % |
| ODVIX $2,321,583<br>**Invesco Oppenheimer Developing Mkts R6**<br>Benchmark Index: MSCI EM NR USD | 0.85 % | XSOE<br>WisdomTree EmMkts ex-Stt-Ownd EntrprsETF | 0.32 % |
| | | RNWGX<br>American Funds New World R6 | 0.60 % |

[22] This is an actively managed fund that, as of March 31, 2020, included over 25% of its holdings in securities that are out-of-benchmark (Russell 1000 Value Index) positions.

| Current Fund Option | Net Expense Ratio | Comparable Funds With Lower Fees | Net Expense Ratio |
|---|---|---|---|
| BPRIX $2,301,969<br>**BlackRock Inflation Protected Bond Institutional**<br>Benchmark Index: BBgBarc US Treasury US TIPS TR USD | 0.65 % | TIP<br>iShares TIPS Bond ETF | 0.19 % |
| | | WAFSX<br>Western Asset Inflation Idxd Plus Bd IS | 0.27 % |
| WATFX $1,870,949<br>**Western Asset Core Bond I**<br>Benchmark Index: BBgBarc US Agg Bond TR USD | 0.45 % | FXNAX<br>Fidelity® US Bond Index | 0.025 % |
| | | AGG<br>iShares Core U.S. Aggregate Bond ETF | 0.04 % |
| | | VTBIX<br>Vanguard Total Bond Market II Idx Inv | 0.09 % |
| | | BAGIX<br>Baird Aggregate Bond Inst | 0.30 % |
| MGLRX $1,554,388<br>**MFS Global Real Estate R6**<br>Benchmark Index: S&P Global REIT TR USD | 0.99 % | VGRNX<br>Vanguard Global ex-US Real Est Idx Ins | 0.11 % |
| | | ARYDX<br>American Century Global Real Estate R6 | 0.75 % |
| MDLOX $1,103,768<br>**BlackRock Global Allocation Inv A**[23]<br>Benchmark Index: Morningstar Gbl Allocation TR USD | 1.08 % | GMWAX<br>GMO Global Asset Allocation III | 0.56 % |
| | | GAOSX<br>JPMorgan Global Allocation I | 0.78 % |
| | | RPGAX<br>T. Rowe Price Global Allocation | 0.95 % |
| TRIPX $720,304<br>**TIAA-CREF International Eq Idx Premier**[24]<br>Benchmark Index: MSCI ACWI Ex USA NR USD | 0.21 % | FSPSX<br>Fidelity International Index | 0.035 % |
| | | FSGGX<br>Fidelity Global ex US Index | 0.056 % |
| | | VTMGX<br>Vanguard Developed Markets Index Admiral | 0.07 % |
| | | VFWAX<br>Vanguard FTSE All-Wld ex-US Idx Admiral | 0.11 % |

101.    The comparisons in table above demonstrate that for at least 18 out of the 26 funds in the Plan as of December 31, 2018, there are many equivalent investments that would have cost participants far less than the funds selected for the Plan by Defendants.

102.    The chart above also demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable alternative funds in the same investment

---

[23] According to the Plan's form 5500, investors in this fund pay revenue sharing of 25 bps.
[24] According to the Plan's form 5500, investors in this fund pay revenue sharing of 15 bps.

style. A reasonable investigation by the Plan's fiduciaries would have revealed the existence of these lower cost alternatives, and would have saved millions of dollars for the Plan and its participants and beneficiaries.

**D.      Defendants Breached Their Fiduciary Duties by Selecting Expensive Actively Managed Funds Instead of Lower-Cost Passively Managed Index Funds**

103.     The comparisons above greatly underestimate the excessiveness of the investment management fees for the Plan's funds because Defendants selected numerous underperforming and unreasonably expensive actively managed funds, when substantially less expensive passively managed index funds would have resulted in superior long-term performance by comparison to the exact same benchmarks used to evaluate the performance of the Plan's fund offerings.

104.     Throughout the Class Period, the Plan has been dominated by expensive actively managed fund, which reflects a flawed fiduciary process. At the beginning of the Class Period, the Plan held only 4 index funds out of a lineup that included 28 investment options: Columbia Mid Cap Index R5; Columbia Small Cap Index R5, Putnam S&P 500 Index Fund Vanguard Total Bond Market Index. This lineup of index funds did not change until at least 2017.

105.     By December 31, 2017, the Plan had substituted the Columbia Small-Cap Index Fund and Columbia Mid-Cap Index Fund for the Vanguard Small Cap Index Fund Admiral and the Vanguard Mid Cap Index Fund Admiral. Even then, Defendants failed to select the lowest-cost shares of these Vanguard funds, picking the Admiral shares instead of the lower-cost Institutional shares.

**E.      Defendant Imprudently Retained Historically Underperforming Plan Investments**

106.     Given Defendants' failure to conduct appropriate due diligence in selecting and retaining Plan investments, numerous investment options underperformed their benchmarks (as

well as lower-cost alternative investments that were available to the Plan).

107.     Prudent fiduciaries of large defined contribution plans must regularly analyze the Plan's investment options to determine whether its actively managed funds will outperform their benchmark, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to continue to offer that particular actively managed option for the particular investment style and asset class.

108.     Defendants failed to undertake such analysis when they selected and retained the actively managed funds discussed below. Defendants provided these fund options without conducting a prudent analysis despite the acceptance within the investment industry that active managers typically do not outperform passive managers net of fees over the long-term.

109.     Had such an analysis been conducted by Defendants, they would have determined that the actively managed funds discussed below underperformed their respective benchmarks over extended periods. Indeed, these funds discussed below have demonstrated persistently poor performance for many years compared to the benchmarks that are used as the appropriate yardsticks to evaluate these fund's investment results.

110.     Defendants' failure to remove these consistently underperforming investments demonstrates the absence of a prudent process to evaluate the Plan's investment offerings. Had Defendants adopted prudent processes in order to discharge their fiduciary duties, the funds below would have been placed on watchlists and tracked on a regular basis to determine if the reason for their poor performance had persisted – in which case the funds should have been removed – or whether the underperformance was merely the result of a transient market trend or some other factor that would correct itself within a reasonable period of time.

111.     Among the Plan's perennial underperforming investment options are the Great-

West Lifetime Conservative target retirement date Collective Investment Trusts ("CIT") for 2015, 2025, 2035, and 2045, which, on information and belief, have unreasonably high expense ratios of 0.68% as compared to comparable target retirement date funds such as the Vanguard Target Retirement funds for 2015, 2025, 2035, and 2045, which have expense ratios that range from 0.13% to 0.15% (*i.e.*, a 135.8% and 127.7% differences, respectively). Such excessive fees alone make these investments imprudent.

112.    However, the imprudence of the Great-West Lifetime Conservative target retirement date CITs is exacerbated by their poor performance relative to their benchmark indices (the Morningstar Lifetime Mod TR USD (2015, 2025, 2035, 2045)), as well as far less expensive target retirement date investment options that were readily available throughout the Class Period, like the Vanguard Target Retirement funds. While each of the Great-West Lifetime Conservative target date CITs underperformed their benchmark indices for the 1-, 3-, 5 and 10-year periods ending on December 31, 2019, the comparable Vanguard Target Retirement date funds mirrored the performance of the same benchmark indices. Given such prolonged underperformance, it was imprudent for Defendants to retain the Great-West Lifetime Conservative target retirement date CITs as investment options in the Plan.

113.    Similarly, it was imprudent for Defendants to select and retain the Alger Capital Appreciation Instl I fund, which has an unreasonably high expense ratio of 1.16% and has underperformed numerous comparable investment options that are benchmarked to the same index – the Russell 1000 Growth TR USD. Funds with expense ratios as low as 0.06% (a staggering **180.3%** difference in cost compared to the Alger Capital Appreciation fund), outperformed the Alger Capital Appreciation fund over 1-, 3-, 5- and 10-year periods as of June 29, 2020, as shown in the table below:

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| **IN PLAN** | ALARX $17,613,174 **Alger Capital Appreciation Instl I** Benchmark Index: Russell 1000 Growth TR USD | 1.16% | 22.02% | 18.27% | 14.16% | 16.40% | 1.06% | -0.05% | -1.39% | -0.50 % |
| *Low Fee Alternative* | VMGAX Vanguard Mega Cap Growth Index Instl | 0.06 % | 25.13% | 18.33% | 15.62% | 16.94% | 4.17% | 0.001% | 0.07% | 0.04% |
| *Low Fee Alternative* | VWUAX Vanguard U.S. Growth Fund Admiral Shares | 0.28 % | 27.24% | 21.43% | 16.25% | 17.51% | 6.28% | 3.10% | 0.70% | 0.61% |
| *Low Fee Alternative* | NASDX Shelton Nasdaq-100 Index Direct | 0.50% | 30.66% | 20.91% | 18.10% | 19.64% | 9.70% | 2.59% | 2.55% | 2.74% |

114.     Another poorly performing investment option that warranted removal during the Class Period is the William Blair Small-Mid Cap Gr I fund, which has an unreasonably high expense ratio of 1.10%, and routinely falls short of its benchmark index, the Russell Mid Cap Growth TR USD. It was imprudent for Defendants to select and retain the William Blair Small-Mid Cap Gr I fund when there were many less expensive investment options available that outperformed the same benchmark index, as shown in the table below:

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| **IN PLAN** | WSMDX $8,311,973 **William Blair Small-Mid Cap Gr I** Benchmark Index: Russell Mid Cap Growth TR USD | 1.10 % | 4.53% | 12.42% | 11.10% | 14.88% | -5.39 % | -1.79 % | -0.22 % | 0.10% |
| *Low Fee Alternative* | OTCKX MFS Mid Cap Growth R6 | 0.74 % | 10.33% | 17.07% | 13.63% | -- | 0.41% | 2.86% | 2.31% | -- |
| *Low Fee Alternative* | IGRFX Ivy Mid Cap Growth N | 0.79 % | 19.80% | 20.15% | 13.72% | -- | 9.88% | 5.94% | 2.40 % | -- |
| *Low Fee Alternative* | CMGIX BlackRock Mid-Cap Growth Equity Instl | 0.80 % | 10.51% | 19.21% | 14.87% | 17.06% | 0.59% | 5.00% | 3.55% | 2.28% |

115.    Yet another underperforming Plan investment offering is the American Funds Europacific Growth R5E fund, which has an unreasonably high expense ratio of 0.61%, and routinely falls short of its benchmark index, the MSCI ACWI Ex USA Growth NR USD. It was imprudent for Defendants to select and retain the American Funds Europacific Growth R5E fund during the Class Period given its anemic performance. While removal of this fund would have been warranted, at the very least Defendants could have selected the lowest-cost share class of this fund, which would have saved participants 15 bps, as shown in the table below:

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | RERHX $4,700,795 **American Funds Europacific Growth R5E** Benchmark Index: MSCI ACWI Ex USA Growth NR USD | 0.61 % | 3.22% | 4.60% | -- | -- | -2.12% | -1.13% | -- | -- |
| *Low Fee Alternative* | RERGX American Funds Euroacific Growth R6 | 0.46% | 3.37% | 4.75% | 4.91 % | 7.45% | -1.97% | -0.99% | -0.57% | 0.53% |

116.    It was also imprudent for Defendants to select and retain the Invesco Oppenheimer Developing Mkts R6 fund, which has an unreasonably high expense ratio of 0.83%, and routinely underperformed – by a wide margin – substantially less expensive investment options that were benchmarked to the same index, the MSCI Emerging Markets NR USD, and were readily available to the Plan throughout the Class Period, as shown in the table below:

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| **IN PLAN** | ODVIX $2,321,583 **Invesco Oppenheimer Developing Mkts R6** Benchmark: MSCI Emerging Markets NR USD | 0.83 % | -1.41% | 4.71% | 5.08% | -- | 2.11% | 2.96% | 1.97% | -- |
| *Low Fee Alternative* | XSOE WisdomTree EmMkts ex-Stt-Ownd EntrprsETF | 0.32 % | 5.79% | 5.15% | 6.00% | -- | 9.50% | 3.23% | 2.70% | -- |
| *Low Fee Alternative* | RNWGX American Funds New World R6 | 0.60 % | 4.68% | 7.32% | 6.88% | 6.85 % | 8.20% | 5.58% | 3.77% | 3.67% |

117.    Besides the Invesco Oppenheimer Developing Markets fund, the Defendants imprudently selected and retained at least three additional unreasonably expensive international funds that routinely underperformed their benchmark indices, as of June 29, 2020, as shown below:

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| **IN PLAN** | FBNRX $1,536,306 **Templeton Global Bond R6** Benchmark: AdvisorShares FolioBeyond Smt Cor Bd ETF | 0.57% | 1.01% | 1.79% | 1.59% | 3.71% | -11.58% | -3.34% | -2.40% | - |
| **IN PLAN** | MDLOX $1,103,768 **BlackRock Global Allocation Inv A** Benchmark Index: Morningstar Gbl Allocation TR USD | 1.08% | 6.55% | 4.62% | 4.21% | 6.04% | 4.01% | -0.62% | -1.37% | -1.08% |
| **IN PLAN** | TRIPX $720,304 **TIAA-CREF International Eq Index Premier** Benchmark Index: MSCI ACWI Ex USA NR USD | 0.21% | -4.80% | 0.83% | 2.09% | 5.87% | -0.00% | -0.30% | -0.17% | 0.89% |

118.    It was also imprudent for Defendants to select and retain the Putnam Stable Value Fund, which was among of the largest holdings in the Plan with $23,999,684 invested as of December 31, 2018. The Putnam Stable Value Fund is an agglomeration of cash alternatives,

Guaranteed Investment Contracts or "GICs", managed synthetics and constant duration synthetics. These include high fee synthetic wrap products from insurance companies like Prudential Life and Metropolitan Life, as well as JPMorgan Chase, insurance separate accounts provided by Mass Mutual and traditional GICs from several insurance companies.

119.    Defendants failed to select the lowest-cost share class of the Putnam Stable Value Fund and instead burdened the Plan with excessive fees, which include at least 35 bps for management fees, 14 bps for wrap fees, and other administrative fees, which total at least 50 bps. By comparison, the lowest-cost share class of the Putnam Stable Value Fund has a management fee of 15 bps, a wrap fee of 14 bps and a total expense ratio of 30 bps. The higher fees of the share class selected and retained by Defendants has diminished the relatively modest returns for participants who have invested in this fund. The table below compares the performance of the Plan's Putnam Stable Value Fund at 35 bps vs. the Putnam Stable Value Fund at 15 bps for the quarter ended March 31, 2020:

| Calendar year performance (%) | 1 year | 5 year | 10 year |
|---|---|---|---|
| Stable Value Fund at 15 bps | 2.55 | 2.15 | 2.39 |
| Stable Value Fund at 35 bps | 2.34 | 1.95 | 2.18 |

120.    In 2015, the Supreme Court unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to monitor the funds discussed above and they continue to retain these funds despite their continuing underperformance compared to their benchmarks. Moreover, as shown above, there were abundant lower-cost investment alternatives readily available to the Plan for each of these investments.

121.    Prudent fiduciaries of defined contribution plans must continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify

38

underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the funds discussed above would have been removed from the Plan.

122.    Had the Defendant removed these funds from the Plan and the amounts been invested in any of the lower-cost alternatives identified herein, participants in the Plan would not have lost millions of dollars' worth of their retirement savings.

**F.    Defendants Breached Their Fiduciary Duties by Retaining Conflicted Investment Advisors and Consultants**

123.    The Company's most recent 5500 lists consultants or investment advisors retained by CDI in 2018 and the amounts of compensation paid by CDI, including $222,583 paid to UBS Financial Services Inc. in Nashville, Tennessee ("UBS"). In 2017, the Plan paid UBS investment advisory fees of $282,994, and in 2016, the Plan paid UBS advisory fees of $262,674. These fees appear excessive as investment advisory fees of over $100,000 per year for plans of this size are not common.

124.    The selection and retention of the investment consultant is one of most import fiduciary duties of a 401(k) committee. Tim Jenkinson, *Picking Winners? Investment Consultants' Recommendations of Fund Managers*, JOURNAL OF FINANCE (Sept. 2014) ("As it is, plan sponsors are making appointments partly uninformed, and some may be naïve about the actual ability of consultants' recommendations.").

125.    Based on SEC documents, UBS appears to be a dual-registered investment adviser ("RIAs"), meaning that the firm received compensation from direct fees from the Plan, as well as fees or commissions from money managers and/or insurance providers.

126.    UBS was fined in 2017 by the SEC for breaches of fiduciary duty in connection with its mutual fund share class selection practices and fees.[25] Specifically, from at least January 2010 through June 2015, UBS disadvantaged certain of its retirement plan brokerage customers "by failing to ascertain that they were eligible for a less expensive share class, and recommending and selling them more expensive share classes in certain open-end registered investment companies ("mutual funds") when less expensive share classes were available. UBS did so without disclosing that it would receive greater compensation from the Eligible Customers' purchases of the more expensive share classes. Eligible Customers did not have sufficient information to understand that UBS had a conflict of interest resulting from compensation it received for selling the more expensive share classes."[26] Moreover, "UBS omitted material information concerning its compensation when it recommended the more expensive share classes. UBS also did not disclose that the purchase of the more expensive share classes would negatively impact the overall return on the Eligible Customers' investments, in light of the different fee structures for the different fund share classes."[27]

127.    Prof. Nicole M. Boyson of Northeastern University, using data from SEC fines, has written a paper which shows that RIAs that both charge fees and commissions (dual registration) use higher-fee, lower-performing mutual fund families that kick back the most in "revenue sharing." Boyson, N., *The worst of both worlds? Dual-registered Investment Advisers*, Northeastern U. D'Amore-McKim School of Business Research Paper No. 3360537 (Dec. 2019).[28]

---

[25]    *See* Order Instituting Administrative and Cease-And-Desist Proceedings, available at: https://www.sec.gov/litigation/admin/2017/33-10433.pdf (last visited July 2, 2020).
[26] *Id*. at 2.
[27] *Id*.
[28] Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3360537 (last visited July 2, 2020).

128.    Prof. Boyson has created a list of high-fee underperforming mutual funds preferred by dual registered RIAs, which includes Putnam Investment Management, John Hancock, JP Morgan, Legg Mason/Western Asset Management, and Fidelity.[29] Given Defendants' retention of UBS, it is no coincidence that Defendants have selected numerous funds from such high-fee fund families during the Class Period.

129.    Broker consultants or dual registered RIAs have an inherent conflict of interest to recommend what pays them the most. Defendants, as fiduciaries of the Plan, should have been aware that UBS was subject to such potential conflicts, but disregarded such risks in retaining them as consultants and investment advisors.

130.    UBS is a party in interest under 29 U.S.C. § 1002(14), as they provide services to the Plan. Defendants, as fiduciaries to the Plan, thus also engaged in prohibited transactions under 29 U.S.C. § 1106(a)(1)(C), by causing the Plan to engage in a transaction constituting a direct or indirect furnishing of goods or services between the Plan and parties in interest using assets of the Plan. These transactions do not qualify for a statutory exemption under 29 U.S.C. § 1108(b)(2), as reasonable compensation for plan service providers, 29 C.F.R. § 2250.408c-2, as the fees charged were high and unreasonable.

## G.    Defendants Failed to Monitor or Control the Plan's Recordkeeping and Administrative Expenses

131.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These

---

[29] *Id*. at 66.

services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

132.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

133.    According to a study conducted by Deloitte Consulting LLP for the Investment Company Institute, on average, administrative expenses – the largest of which, by far, is recordkeeping – make up 18% of total plan fees. *See Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013: A study assessing the mechanics of the 'all-in' fee*, at 17 (Aug. 2014) (stating: "recordkeeping, administrative and financial advice fees made up 18% of total fees").[30]

134.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

---

[30]    Available at:   https://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-cons-401k-fee-study-2013-082014.pdf (last visited July 2, 2020).

135.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

136.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees in order to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees, and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336.Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

137.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

138.     Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a

plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

139.    Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

140.    Defendants have failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps. Defendants permitted the Plan to pay its recordkeeper, Great-West Life & Annuity Insurance ("Great-West"), which has provided recordkeeping services since 2015, excessive fees through opaque revenue sharing. Revenue-sharing fees are "[i]ncluded within the expenses of some share classes, these fees are funneled from the asset manager who collects them to the recordkeeper of the plan where the share class is being used." Aron Szapiro & Lia Mitchell, *Retirement Plan Transparency: Opaque Data Hinders*

44

*Best-Interest Advice*, Morningstar Research (June 2018).

141.    Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation, or may be used as kickbacks to induce recordkeepers to include the investment company's high-priced funds included as plan investment options. As one industry expert noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers.  This is because most revenue sharing is asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

142.    Another problem is that "revenue sharing is not equivalent among all funds; some funds pay no revenue sharing and others pay different revenue-sharing rates. The issue then arises that it may not be fair for some participants to pay a higher expense ratio because revenue sharing is built in. Another concern is that plan participants who invest in more expensive, revenue-sharing funds are bearing a disproportionate amount of the plan's administrative costs compared with their coworkers who have chosen funds without revenue sharing." Jennifer DeLong, *Coming to Grips with Excess Revenue Sharing*, Context, The AllianceBernstein Blog on Investing (June 2014).[31] Thus, prior to the Class Period, AllianceBernstein noted, "the prevalence of revenue sharing is decreasing as more plans rethink their strategies for making plan fees more transparent." *Id*.

143.    As recognized prior to the Class Period, the best practice is a flat price based on the

---

[31] Available at: https://blog.alliancebernstein.com/post/en/2014/06/coming-to-grips-with-excess-revenue-sharing (last visited July 2, 2020).

number of participants in a plan ensures that the amount of compensation is tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.*, an increase in assets in the plan. Indeed, in May 2014, AllianceBernstein advised: "DC plans and their fiduciaries may be better served to modify or change the plan design a bit, and it might be wise to consider removing excess revenue sharing from the picture altogether. One route to that solution would be to consider share classes or investment vehicles with lower—or no—revenue-sharing rates. Daniel Noto, *Rethinking Revenue Sharing*, AllianceBernstein (May 2014).[32]

144.    While Defendants disclosed small amounts of direct compensation to Great-West for recordkeeping in the Plan's form 5500s for 2014 – 2017, they also checked off the box on each form 5500 for payments of "indirect compensation" to Great-West. But they chose not to disclose the actual amounts of these much larger payments and, thus, concealed the total compensation the Plan paid Great-West as well as the Plan's per participant recordkeeping costs. The conservative estimates, below, indicate that the recordkeeping fees paid to Great-West were excessive:

| Year | Number of Participants | Disclosed Direct Compensation | Estimated Indirect Compensation | Total Compensation | Estimated Per-Participant / Per Year Cost |
|---|---|---|---|---|---|
| 2018 | 7,030 | $275,713 | $263,219 | $538,932 | $76.66 |
| 2017 | 7,286 | $2,720 | $301,374 | $304,094 | $41.74 |
| 2016 | 7,719 | $1,504 | $275,760 | $277,264 | $35.92 |
| 2015 | 6,956 | $2,024 | $268,134 | $270,158 | $38.84 |
| 2014[33] | 7,000 | $3,054 | $408,108[34] | $411,162 | $58.74 |

145.    As shown above, Defendants disclosed only minimal direct compensation to Great-West, however, the hundreds of thousands of dollars of additional compensation that Great-West

---

[32]      Available      at:      https://www.alliancebernstein.com/Research-Publications/CMA-created-content/Institutional/Instrumentation/DC_RethinkingRevenueSharing.pdf (last visited July 2, 2020).

[33] According to the Plan's 2014 form 5500, Putnam Investor Services, Inc. ("Putnam") provided recording keeping services to the Plan in 2014. The 2014 form 5500 reports indirect compensation to Putnam as "10 BPS", which presumably reflects a revenue sharing arrangement with the Plan.

[34] The Plan disclosed the amount of indirect compensation it paid to Putnam in 2014.

received through revenue sharing were not disclosed in the Plan's 5500s. Instead, Defendants obliquely reported in the 2015 form 5500 that Great-West receives "10 BPS," which presumably reflects a 10 bps charge on aggregate total Plan assets (this assumption is the basis for the calculations of estimated indirect compensation in the chart above).[35] However, these estimates do not include additional compensation that Great-West received through fees it charged as expense ratios on the Great-West Lifetime Trust I funds (2015, 2015, 2035, 2045, and 2055). Thus, the total annual compensation received by Great-West likely was far greater than the estimates in chart, above.

146.    Moreover, as shown above, the compensation that Great-West received for providing recordkeeping services has increased each year since 2015. Given the prevailing trends in the competitive marketplace for recordkeeping services during this time period, the exact opposite should have occurred. Furthermore, the increase in the amount of Great-West's compensation for recordkeeping (as measured on a per participant basis) has out-paced the minimal growth in the number of participants in the Plan between 2014 and 2018. Long before the Class Period, experts "opined that a reasonable fee for the kind of recordkeeping services the Plan needed would have been between $20 and $27 per participant per year…." *George*, 641 F.3d at 798. Thus, the escalating costs of recordkeeping demonstrate that Defendants failed to monitor effectively the Plan's recordkeeping costs and failed to control such expenses which resulted in a loss to the Plan of substantial assets.

---

[35] The Plan's Form 5500 for 2016 reports that the Plan has a revenue sharing arrangement with Great-West, whereby the "revenue sharing amounts received are credited to an administrative account, which is used to pay administrative expenses incurred by the Plan. During 2016 and 2015, the Plan earned $310,764 and $284,453, respectively, in fee income. As of December 31, 2016 and 2015, the balance in the administrative account was $158,918 and $138,999, respectively." The Plan's Form 5500 for 2018 reports: "During 2018 and 2017, the Plan earned $1,053,820 and $313,497, respectively, in fee income. As of December 31, 2018 and 2017, the balance in the administrative account was $107,431 and $40,840, respectively."

147.     Given the increase in size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services that would have been provided to the Plan by Great-West Life. Great-West normally performs tasks for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping and information management (computing, tabulating, data processing, etc.)

148.     In other words, the services that Great-West provided were nothing out of the ordinary. A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted separate and independent breaches of the duties of loyalty and prudence.

149.     Contrary to Defendants' flawed approach, the practice embraced by the majority of plans with assets of $250 million or more, like CDI, is for the plan to pick up all the administrative fees, and not to engage in what amounts to an opaque kickback scheme.

150.     The meager information Defendants disclosed about the Plan's administrative fees exemplifies the criticism leveled by Morningstar Research, that the "information on the administrative and investment fees participants pay is inaccurate and limited. These constraints undermine the entire purpose of public financial reporting, as the data is not actionable." Aron Szapiro & Lia Mitchell, *Retirement Plan Transparency: Opaque Data Hinders Best-Interest Advice*, Morningstar Research (June 2018).

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against CDI and Committee Defendants)**

151.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this

Complaint as if fully set forth herein.

152.    At all relevant times, the Company and Committee Defendants ("Prudence

Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A), in that they exercised discretionary authority or control over the administration

and/or management of the Plan or disposition of the Plan's assets.

153.    As fiduciaries of the Plan, Defendants were subject to the fiduciary duties imposed

by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of

the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with

the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a

like capacity and familiar with such matters would use in the conduct of an enterprise of like

character and with like aims.

154.    The Prudence Defendants breached these fiduciary duties in multiple respects as

discussed throughout this Complaint. They did not make decisions regarding the Plan's investment

lineup based solely on the merits of each investment and what was in the interest of Plan

participants.  Instead, the Prudence Defendants selected and retained investment options in the

Plan despite the high cost of the funds in relation to other comparable investments. The Prudence

Defendants also failed to investigate the availability of lower-cost share classes of certain mutual

funds in the Plan. In addition, the Prudence Defendants failed to investigate separate accounts

and/or collective trusts as alternatives to mutual funds, even though they generally provide the

same investment management services at a lower-cost. Likewise, the Prudence Defendants failed

49

to monitor or control the grossly excessive compensation paid for recordkeeping services.

155.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

156.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

157.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against CDI and the Board Defendants)

158.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

159.    CDI and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

160.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

161.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to CDI and the Board Defendants.

162.    CDI and the Board Defendants breached their fiduciary monitoring duties by, among other things:

> (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;
>
> (b)    failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and
>
> (c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

163.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had CDI and the Board Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

164.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), CDI and the Board Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Fed. R. Civ. P. 23(b)(2);

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Employer Defendants as necessary to effectuate said relief, and to prevent the Employer Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: July 7, 2020                           By:      */s/Eric Lechtzin*
                                                       Eric Lechtzin (PA ID # 62096)
                                                       Marc H. Edelson (PA ID # 51834)
                                                       **EDELSON LECHTZIN LLP**
                                                       3 Terry Drive, Suite 205
                                                       Newtown, PA 18940
                                                       Telephone: (215) 867-2399
                                                       Facsimile: (267) 685-0676
                                                       elechtzin@edelson-law.com
                                                       medelson@edelson-law.com